OPINION TURNER, Judge: The petitioner contends that its predecessor, First Western Bank & Trust Co., retired the 526 California Street building and certain building accessories, vault equipment, and banking fixtures by abandonment during 1958, and thereby sustained a loss deductible under section 165 (a)[6] or section 167(a)[7] of the Internal Revenue Code of 1954. It is the contention of the respondent that the bank sustained no loss due to abandonment of the property in 1958, but to the contrary sold the property in 1959, realizing a gain thereon. According to subsection (a) of section 1.167(a)-1, Income Tax Regs., the allowance for depreciation, which includes a reasonable allowance for obsolescence, is that amount which should be set aside for the taxable year under a reasonably consistent plan, so that at the end of the estimated useful life the aggregate of the amounts so set aside, plus the salvage value, will equal the cost or other basis of the property. By subsection (b), it is provided (1) that for the purposes of section 167, supra, “the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production” of income, (2) that “experience with similar property taking into account present conditions and probable future developments” is a matter for consideration in determining the period of estimated useful life, (3) that salvage is not a factor, and (4) that “The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination.” Under subsection (c), “Salvage value must be taken into account in determining the depreciation deduction either by a reduction of the amount subject to depreciation or by a reduction in the rate of depreciation, but in no event shall an asset (or an account) be depreciated below a reasonable salvage value.” In section 1.167(a)-9 of the regulations, dealing with obsolescence, it is specifically provided that “In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated life computed in accordance with such showing will be permitted.” The provisions covering the determination of the tax consequences of the retirement of a depreciable asset are set forth in section 1.167(a)-8 of the regulations. As used therein, “retirement” is defined to mean “the permanent withdrawal of depreciable property from use in the trade or business or in the production of income.” The withdrawal “may be made by selling or exchanging the asset, or by actual abandonment” and “the asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account.” Where, as here, the basis of the claim of loss is abandonment, the pertinent regulation is subsection (a)(4) of section 1.167(a)-8, and petitioner does not claim otherwise. Subsection (a)(4) reads as follows: Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition. As for section 165 of the Code, also relied on by the petitioner, the regulations thereunder, section 1.165-2, specifically refers to section 1.167(a)-8 as the regulation covering the allowance “of losses arising from the permanent withdrawal of depreciable property from use in the trade or business or in the production of income.” In order to establish actual physical abandonment, there must be an intention on the part of the owner to abandon the property coupled with an act of abandonment, both to be ascertained from all facts and surrounding circumstances. Beus v. Commissioner, 261 F. 2d 176, affirming 28 T.C. 1133; Talache Mines v. United States, 218 F. 2d 491. Mere nonuse of the property is not sufficient. Beus v. Commissioner, supra; Citizens Bank of Weston, 28 T.C. 717; Ewald Iron Co., 37 B.T.A. 798; I. G. Zurrmalt, 25 B.T.A. 566. The facts show that in 1955 the bank had decided that the 526 California Street building was unsuited and inadequate for its needs and either in 1955 or at the latest early in 1956 decided to remodel the 405 Montgomery Street building to meet its requirements and to move its banking operations into that building when the remodeling had been completed. The question was what would it do with the 526 California Street building, States Hotel, and the parking lot property. By the end of August 1957, all employees had been moved from 526 California and States Hotel. Certain furniture, equipment, and records remained and 526 California was also used for storing records for the comptroller and records relating to the banking operations of the main office. At or about the same time, the bank’s managing committee was recommending that negotiations for the sale of the property be commenced and that no attempt be made to rent the property or to allow its use for any purpose. As a matter of fact, Capital Co., a real estate development corporation and likewise a subsidiary of Transamerica Corp., was studying the feasibility of buying the three properties as a site for an office building and the bank had agreed not to dispose of the properties until Capital Co. had reached its decision. In keeping therewith, the bank in July of 1957 rejected an offer of $1,300,000 for the properties and on November 8, 1957, received an inquiry from a corporation with which it did a large amount of business about leasing the properties. The response to the inquiry, made on November 22, was that the buildings were not available for lease at that time. In October of 1957, Coats, the president, instructed York, a vice president, to investigate the possibility of securing a reduction in real property taxes. York learned that the critical date was the first Monday in March of each year, the asseessment date, and that the first date for his purpose would be the first Monday in March of 1958. He also learned that he would be expected to make a showing that the buildings were not being used on that date. To make the required showing, the records and furniture were removed by March 3, 1958, and reduction in the real estate taxes was procured, with the assessor’s office indicating to York that if prior to July 1, 1958, word was received of definite plans to demolish the buildings, a further reduction in taxes would be possible. To that end, York on June 5, 1958, made an attempt to make a satisfactory showing to the assessor’s office, writing that the buildings had been definitely vacated and abandoned and that “It is expected that these buildings will be demolished however no definite schedule has been set for this demolition.” With respect to demolition, however, we are satisfied from the evidence that the bank’s purpose and intention was at all times to sell the properties, including the buildings, and that demolition by the bank was not in fact ever very seriously in the picture. The facts further show that after removing the records and furniture from the building, to obtain the reduction in real estate taxes, the bank continued to maintain its insurance against fire and other hazards. Water service was continued and though the other utilities were cut off the meters for steam, electricity, and gas were retained and “standby” charges were paid therefor. Some lighting fixtures and telephones were removed, but others remained, as did the gas heating plant. The electrical and telephone wiring also remained. Two vault doors which the bank planned to retain were also left in place. The bank continued to carry the 526 California Street building as an asset on its books and to record depreciation thereon. On August 15, 1958, Capital Co. advised the bank that due, among other things, to involvement in another project it was not interested in acquiring the properties in question, whereupon Coats immediately notified Coldwell, Banker & Co., who had submitted the earlier offer of purchase, and Coldwell quite promptly produced the offer from Cahill Brothers, Inc., which proved to be the successful offer. Cahill Brothers, Inc., had done the remodeling of 405 Montgomery for the bank. The formal offer was received by letter dated August 25,1958, wherein it was proposed that $50,000 be accepted for a 90-day option to purchase the three properties for $1,550,000, with the privilege of extending the option for a further period of 60 days upon a further payment of $25,000. Both of these payments were to be applied to the purchase price upon exercise of the option. Two days later, August 27,1958, Coats wrote the president of First-america Corp. (which had succeeded Transamerica to the position of majority stockholder of the bank), seeking approval of the sale pursuant to the Cahill offer. Appended to the letter was a schedule setting forth that the result of the sale would be the realization of gain in the amount of $697,014.07 and the details from which this result was derived. There was no reduction of basis which in any way reflected that any abandonment of the improvements had occurred or was intended. The response of Firstamerica is not shown, but on September 17, 1958, the board of directors unanimously approved the offer from Ca-hill Brothers, Inc., and on September 22, 1958, the bank and Cahill Brothers, Inc., executed an option agreement, incorporating the terms of the offer and providing that the payments made for the option would be forfeited if the option were not exercised within the time allotted. Concurrently therewith Cahill Brothers paid the $50,000 as required by the agreement. The agreement contained a provision whereby the bank, for the period until the option was exercised and for 25 days thereafter, should have the right to remove “any bank fixtures, vault doors or lighting equipment located in the buildings,” such property to remain the property of the bank free of any claim on the part of the purchaser. The agreement required execution by the purchaser of a covenant that for a period of 20 years from the date of purchase, the purchaser would not use or permit the use of the property for conducting “the business of a state or national commercial or savings bank or trust company or the business of a state or federal building and loan or savings and loan association or corporation or the business of a loan company similar to the present business of Morris Plan and Fireside Thrift.” This restriction was of the type customarily required by the bank in sales of former banking properties and had been previously agreed to by a letter between the parties dated September 3. On some undisclosed date after the receipt of the Cahill offer and after the preparation by the comptroller of the schedule showing what would be the result of the sale of the properties pursuant to the offer which was sent to Firstamerica on August 27 (but whether before or after the approval of the offer on September 22 is not shown), the comptroller advised Coats that on the basis of tax research by a member of his staff and of discussions with the bank’s accountants and tax counsel, he had concluded that the bank should “write down” on its books the 526 California Street building, its building accessories, vault equipment, and bank fixtures, and should claim an abandonment loss for the property on its 1958 income tax return. The “abandonment” of the 526 California Street improvements was brought up before the bank’s board of directors at a meeting held October 15, 1958. According to the minutes, Coats stated to the board that “all of the personnel and the bank offices were moved out of these buildings late in 1957, and all of the furniture and equipment was moved out of the buildings early in 1958 and the buildings were completely abandoned.” He noted that the option to purchase the properties had been “extended” to Cahill Brothers with the approval of the board. Also according to the minutes, “the Chairman expressed the view, concurred in by the Board, that the approval by this Board to the extension of option was also approval by this Board of the action of the officers in abandoning the properties as described by the Chairman, and that no further action in that regard need be taken at this meeting.” The minutes further recited that the chairman suggested that “this matter be called to the attention of the comptroller of the bank so that proper accounting entries might be made in accordance with the facts as outlined by the Chairman.” Coats thereafter instructed the comptroller to make the appropriate accounting entries, and on October 24,1958, entries were made writing off the 526 California Street building, the building accessories, vault equipment, and bank fixtures. As entered, the writeoffs were Building — $187,954.10, Building Accessories — $28,655.82, Vault Equipment — $48,852.02, and Banking Fixtures — $2,091.65, for a total of $267,553.59, the explanation of the entry being “To write-off as abandonment 526 Calif. St. and States Hotel buildings as of 10/31/58.” The record is unclear as to the extent to which the categories Building Accessories, Vault Equipment, and Banking Fixtures written off included bank fixtures, vault doors, or lighting equipment, specifically reserved to the bank under the option agreement until the exercise of the option and for a period of 25 days thereafter. The facts do show that the bank did remove the vault doors and from the evidence relating to their removal it may not be concluded that they were a minor or insignificant item. Further, the evidence shows that not later than early 1956 and possibly in 1955 the bank concluded from a study of the 526 California Street building that it did not meet its needs and feasibly could not be remodeled to do so, and the plans were set to move its operations therefrom as soon as the remodeling of the 405 Montgomery Street building should be completed. It does not appear, however, that at the end of 1955, 1956, or 1957, the bank, pursuant to the provisions of sections 1.167(a)-l(b) and 1.167(a)-9 of the regulations, made a redetermination as to whether by reason of the developments set forth there had been a curtailment in the previously estimated useful life of the property due to obsolescence, allowance for which should be made in those years. Be that as it may, there was no such redeter-mination, and the bank continued to record and claim depreciation on the basis of the previously estimated useful life of the properties until October 1958, when the entire undepreciated cost of Building, Building Accessories, Vault Equipment, and Banking Fixtures remaining on its books was written off “as abandonment 526 Calif. St. and States Hotel buildings as of” October 31,1958. On the facts as shown by the evidence of record, we are convinced and accordingly conclude and hold that there was no abandonment of the properties in question within the meaning of the statute and the regulations thereunder, but there was at all times the purpose to retain and hold the properties for sale. And whatever the references to abandonment in the minutes and the intraoffice communications or in the correspondence with the assessor seeking a reduction in the real estate taxes there was never any intention on the part of the bank to scrap or demolish the property or irrevocably to discard it so that it would not be retrieved for sale. In our consideration of the evidence and the questions posed, we have not ignored the opinions expressed by one or more of the witnesses that the improvements were not in fact assets but liabilities and the land would be of greater value without them. Although there is no showing as to the value of the salvage when compared to cost of demolition, it could well be that where the purpose to which the land was to be put by the purchasers was such as to require complete removal of existing improvements the property would have commanded a higher price absent the improvements. If, however, it be accepted as a fact that the improvements were a liability in 1958, it could well follow that, at some point in 1955 or early 1956, and possibly even before, a redetermination of useful life was required as provided by sections 1.167(a)-1(b) and 1.167(a)-9 of the regulations. No such question has been argued, and we are not called on to decide it. Relying on S. S. White Dental Mfg. Co. v. United States, 102 Ct. Cl. 115, 55 F. Supp. 117, petitioner argues that it matters not that the property was sold if prior to sale it was discarded or abandoned. We think such reliance is misplaced. In that case, the taxpayer operated three manufacturing plants, located at Frankford, Pa., Northwood, Pa., and Staten Island, N.Y. In 1936 and 1937 the Northwood plant was in good condition and adequate for the taxpayer’s operations. However, to effect operating economies, the taxpayer’s executive committee decided, on April 1, 1936, to transfer the operations of the Northwood plant to Staten Island and to build a new plant at the latter location to house the consolidated operations. The new plant was completed and all operations of the Northwood plant were moved into it by May 1, 1937, at which time the Northwood plant was vacated. It was not thereafter used by the taxpayer. The Northwood plant was offered for sale in 1936 and was sold on July 1, 1937, for a net sale price substantially less than its adjusted basis. The Commissioner treated the taxpayer’s loss as a loss in 1937 on the sale of a capital asset. Under section 117(d) of the Revenue Act of 1936, such losses were deductible only to the extent of $2,000 plus the amount of capital gains. The taxpayer contended that its loss was deductible in full as a loss on abandonment under section 23(f) of the 1936 Act, the predecessor of section 165(a) of the 1954 Code. Interpreting the regulations then applicable, Regs. 94, article 23(e)-3, in a manner not entirely free from controversy, the Court of Claims held the loss to be a loss on abandonment. Since the decision in S. S. White Dental Mfg. Co. turned entirely on the interpretation of certain regulations differing significantly from those involved in this case, we do not consider that decision to bo controlling here. In S. S. White Dental Mfg. Co. it was found as a fact that the North wood plant had been in good condition and adequate for the taxpayer’s manufacturing operations. Apparently the taxpayer intended from the outset to sell the plant. However, no provision of the regulations then applicable expressly denied recognition of the loss where the intent of the taxpayer was to retrieve the property for sale, exchange, or other disposition. The regulation applicable in this case, section 1.167 (a)-8, Income Tax Regs., does contain a provision to that effect.[8] Decision will he entered for the respondent. SEC. 165. LOSSES. (a) General Rule. — There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by Insurance or otherwise. SEC. 167. DEPRECIATION. (a) General Rule. — There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (Including a reasonable allowance for obsolescence)— (1) of property nsed In the trade or business, or (2) of property held for the production of income. In passing It may be observed that the years involved in tbe S. S. White Dental Mfg. Co. case were 1930 and 1937 and that by the enactment of sec. 117(j) in the 1942 Act, now included in sec. 1231, 1954 Code, losses on the sale of property used in the trade or business are no longer restricted to $2,000 plus the amount of capital gains realized.