**TANFORAN CO., Inc., Plaintiff,**
v.
**UNITED STATES of America, Defendant.**

No. 45579.

United States District Court,
N. D. California.

May 20, 1970.

Edward W. Rosston, Jerry H. Robinson, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for plaintiff.

Cecil F. Poole, U. S. Atty., Richard L. Carico, John M. Youngquist, Asst. U. S. Attys., San Francisco, Cal., for defendant.

## ORDER GRANTING JUDGMENT IN FAVOR OF PLAINTIFF

ZIRPOLI, District Judge.

This is an action brought by plaintiff for the recovery of income taxes and interest paid for the calendar years 1960, 1961, 1962 and 1963. The jurisdiction of this court is based upon Section 1346 (a) (1) of Title 28 U.S.C.

Without going into the details of the arm's-length negotiations and transactions which led thereto, in November of 1959 plaintiff purchased the race track and all other assets of Tanforan Company, Ltd. (previously owned by Garden State Racing Association) for a total purchase price of $5,036,744. The assets thus acquired by plaintiff consisted of the land, buildings, land improvements, equipment and a racing franchise (a racing franchise subject to annual renewal, but which under the circumstances carried with it a foregone conclusion that the racing dates previously allocated to Tanforan Company, Ltd. would be approved by the California Horse Racing Board).

With the close of the 1963 racing season plaintiff terminated all racing at Tanforan, discharged its maintenance crew, terminated pay for Tanforan's plant superintendent, discontinued any maintenance of Tanforan's facilities, closed its plant for all practical purposes, no longer had any use for its buildings (with the exception of the administration building and the warehouse-shop) and assigned to its subsidiary, Tanforan Racing Association, all of its tangible personal property used in connection with its racing operations. This personal property was physically removed from the Tanforan track during the period from October 3, 1963 to April 30, 1964.

Plaintiff contends that by reason of such termination of the use of the race track, its buildings (excepting the administration building and the warehouse-shop which were used by plaintiff in 1964), land improvements and equipment had no further value because of retirement from use by reason of loss of usefulness resulting from changed circumstances, or, alternatively, because of retirement by actual physical abandonment, or, alternatively, because the race-

track became obsolete in 1963, and that the undepreciated cost thereof as of December 31, 1963, was properly deducted in its income tax return for the year 1963. No claim is made for the undepreciated cost of the administration building and the warehouse-shop.

In determining whether plaintiff properly deducted in its 1963 income tax returns the undepreciated cost of the racetrack buildings, land improvements and equipment as of December 31, 1963, the issues framed by the Pre-Trial Order and remaining to be decided by the court are as follows:

1. To what assets and in what amounts is the plaintiff's purchase price of the Tanforan properties to be allocated?

2. What were the useful lives of plaintiff's buildings and improvements as of November, 1959 for the purpose of computing depreciation allowances?

3. Did the plaintiff properly deduct in its 1963 income tax return the undepreciated cost of the racetrack buildings, improvements and equipment as of December 31, 1963? This issue, as already indicated, resolves itself into the following alternative questions:

a. Did the plaintiff in 1963 permanently retire its racetrack from use by reason of the loss of usefulness of the track resulting from changed circumstances?

b. Did the plaintiff in 1963 permanently retire its racetrack by actual physical abandonment?

c. Did the racetrack become obsolete in 1963?

All other issues set forth in paragraph 7 of the Pre-Trial Order, excepting one on which the court will herein comment, have been settled by the parties (Stipulation Re Settlement of Certain Issues, filed January 3, 1969). The exception relates to plaintiff's claims (Amended Complaint) for recovery of taxes paid for the years 1960 and 1961 on grounds allegedly not raised in its initial refund claims, and presents issues that need not be decided by the court since the court's resolution of the three above specifically enumerated issues renders moot the latter claims for 1960 and 1961.

The court's answers to the three above stated issues are as follows:

1. The plaintiff's purchase price of the Tanforan properties in November, 1959 should be and is hereby allocated to the following assets and in the following amounts:

| | |
|---|---:|
| Land | $3,200,000 |
| Buildings | 1,123,136 |
| Land Improvements | 425,000 |
| Equipment | 125,000 |
| Intangibles (Racing Franchise) | 152,710 |

The value of the land and the value of the equipment are fixed by stipulation of the parties. The value of the buildings and land improvements is fixed by and taken from the values given thereto by the expert witness Vaughan derived from a summation of cost approach. The court finds the values fixed by the expert Vaughan to be more reliable than those fixed by the expert Moore, who obviously was less competent to appraise racetrack buildings and improvements than Vaughan and who clearly had had no previous experience in the appraisal of racetracks or other reasonably related businesses or enterprises. Having these values established the court determined the residual or intangible value by deducting the income imputed to the land, buildings, land improvements, equipment and working capital ($300,000, which the court finds to be a reasonable figure) from the stabilized net income (annual) of the track in accordance with the computation attached hereto as Appendix "A".

2. The useful lives of plaintiff's buildings, improvements and equipment as of November, 1959 for the purpose of computing depreciation allowances was 12 years. The stabilized net income of the track is fixed at $700,000. Neither Vaughan's figure of stabilized net income of $640,000 nor Moore's figure of stabilized net income of $729,000 is acceptable to the court. The court, based upon a reasonably realistic history of past earnings taken from Moore's re-

port and Vaughan's testimony, concludes that the appropriate figure for stabilized net income should be $700,000 and so finds. The income imputed to the land is fixed at seven per cent, the figure suggested by the government's witness. This seven per cent rate is appropriate, since the witnesses could find no evidence in the market place that the Tanforan land could have been put to better economic use than as a racetrack in 1959. The income imputed to the buildings, land improvements and equipment, which had a single purpose and involved relatively high risk capital investments, is fixed at 15 per cent. This is a figure the court finds to be reasonable and is based upon such single use purpose of the land, improvements and equipment, the relatively high risk involved in such capital investments and all the other factors relating to racing or similar enterprises.

3. The heart of plaintiff's claim lies in the third issue, which the court resolves favorably to the plaintiff. The court is satisfied that plaintiff properly deducted in its 1963 income tax return the undepreciated cost of the racetrack buildings, improvements and equipment as of December 31, 1963 for all three of the reasons it assigned therefor and furthermore that the sale of the land of Tanforan in 1964 was independent of the discontinuance of racing at Tanforan in 1963. Had the sale of the land not occurred when it did the government in all probability would not have questioned the deduction of undepreciated costs in 1963. Hence the court will hereinafter comment on the relationship, if any, of the sale of the land to the discontinuance of racing at Tanforan in 1963.

▉ The propriety of plaintiff's deduction in its 1963 income tax return of the undepreciated cost of the racetrack buildings and improvements as of December 31, 1963 is to be determined under the depreciation provisions of the Internal Revenue Code. The components of the depreciation allowance are cost, the salvage value, and the useful life of the property. Here we are primarily concerned with useful life. While defendant disputes the cost to be allocated to each of the depreciable assets, the parties have agreed that there was no salvage value in any of the assets involved at the end of the table year 1963. Under the scheme set forth in the regulations of the Treasury Department, determination of the useful life element encompasses obsolescence, retirement and abandonment considerations occurring during the year 1963, as well as the more traditional depreciation concepts. Treas.Reg. §§ 1.165–2(c), 1.167 (a)–8(a), 1.167(a)–9. See also Keller Street Development Co. v. Commissioner of Internal Revenue, 323 F.2d 166 (9th Cir. 1963); United California Bank v. Commissioner of Internal Revenue, 41 T.C. 437, aff'd per curiam, 340 F.2d 320 (9th Cir. 1964). The deductions claimed by Tanforan come within all three of these separate provisions and are properly allowable either:

(a) As an obsolescence adjustment to remaining useful life under Treasury Regulations Section 1.167(a); or

(b) As a permanant retirement from use in Tanforan's business under Treasury Regulations Section 1.167(a)–8(a) (3); or

(c) As an abandonment under Treasury Regulations Section 1.167(a)–8(a) (4).

The application of these provisions is supported by the following events which occurred for the most part in 1963, which could not have been foreseen in 1959, when the racetrack was acquired, and which lead irresistibly to the conclusion that racetrack buildings and improvements previously used by Tanforan in its business had no useful life by the end of 1963:

1. The acquisition by William Gilmore in 1961 of over 81 per cent of the stock of Pacific Turf Club, making it likely that future agreement could be reached between Tanforan and Pacific Turf Club.

2. The issuance of the Blyth reports in 1962 as to the economic feasibility of

a consolidation of Northern California racing.

3. The adoption in January, 1963 of the freeway route which would within four to six years take a substantial portion of Tanforan's prime parking area.

4. The enactment of the new legislation in 1963 enabling Tanforan for the first time to race its allotted days in Alameda County.

5. The negotiation of the leases for the racing of Tanforan's allotted days at the Bay Meadows and Golden Gate Fields racetracks.

6. The need which arose in 1962 and 1963 to make major repairs to the track and the awareness in December, 1963 that over $500,000 of capital improvements would have to be made to the Tanforan track if racing was to continue there for any length of time in the future.

■ Useful life of an asset must be determined with reference to its use in the business of a particular taxpayer, and it must be redetermined at the end of each year to reflect significantly changed circumstances.

■ Two key characteristics of "useful life" should be emphasized at the outset. First, "useful life is measured by the use in a taxpayer's business, not by the full abstract economic life of the asset in any business." Massey Motors, Inc. v. United States, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960). Thus, Treasury Regulations Section 1.167(a)–1(b) provides that:

"the estimated useful life of an asset is not necessarily the useful life inherent in the asset, but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income."

This same regulation sets forth as some of the factors to be considered in the determination of useful life:

"(1) Wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic or other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements."

Obviously, useful life for income tax purposes may bear no relationship whatever to the inherent physical life of an asset; instead, useful life is purely subjective, depending upon the intended use of the assets in the taxpayer's business.

■ The second important characteristic of useful life is that it may become longer or shorter during the time an asset is held by the taxpayer. Since circumstances may change from the time an asset is first acquired, useful life is subject to redetermination at the end of every taxable year. Treasury Regulations, Section 1.167(a)–1(b) specifically requires such periodic redeterminations by providing that:

"The estimated remaining useful life of an asset may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation."

Cf. Treas.Reg. § 1.167(a)–9; United California Bank v. Commissioner of Internal Revenue, 41 T.C. 437, 456 (1964).

As already indicated by the court, independent of any other ground, the deduction in the present case is allowable as an obsolescence adjustment of remaining useful life. Treasury Regulations, Section 1.167(a)–9 provides that:

"The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, superses-

sion or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action."

The inclusion of obsolescence as a depreciation concept has given rise to a number of special problems, stemming largely from the fact that events causing obsolescence are not usually foreseeable at the time an asset is acquired and the original depreciation is determined. Accordingly, it was early established that useful life of an asset should be adjusted during the term of its ownership to reflect developing obsolescence. Thus, the above Treasury Regulation continues:

"In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted."

Simply stated, at the end of 1962 the facts then present would not have afforded a basis for reducing the remaining useful life of the racetrack assets; by the end of 1963, however, the facts plainly establish that these assets had no further use to Tanforan as the result of the combination of a number of objective events which rendered the racetrack assets "economically useless to the taxpayer." Treas.Reg. § 1.167(a)–9. These objective events were (a) the 1963 legislative enactment of the State of California which, for the first time, enabled Tanforan to race a portion of its allocated racing dates at Golden Gate Fields; (b) the considerable pressure brought to bear upon plaintiff and other racing interests from horsemen, the California Horce Racing Board and others to take whatever action was necessary to establish fixed racing dates in Northern California; (c) the necessity of making expensive repairs and improvements at Tanforan; (d) the negotiating of leases of Bay Meadows and Golden Gate Fields, thereby enabling Tanforan Racing Association (the subsidiary of plaintiff) to run Tanforan's previously allocated racing days at these other two Northern California tracks; and (e) the approval on January 23, 1963, of Route B for State Highway 229, which when constructed would result in the condemnation and taking over of a portion of Tanforan's prime parking lot (which was already inadequate), thereby rendering approximately 50 per cent of that lot unusable.

There isn't any doubt in the court's mind that the 1963 legislation opened up possibilities which made the continuation of racing at Tanforan economically unjustifiable. As the Treasury Regulation on obsolescence recognizes "legislative or regulatory action" is one of the causes of obsolescence. And legislation making the continued use of property uneconomical, in practical effect, creates as much obsolescence as legislation completely prohibiting the use of property.

Likewise, the court is of the view that the pressures brought to bear on plaintiff from horsemen and the California Racing Board and the above stated need for extensive repairs and improvements, which in 1963 were estimated to involve a cost of $500,000, greatly added to the obsolescence of Tanforan's racetrack assets, particularly when these pressures and needs are balanced against the quality competition encountered from more modern tracks.

As for the leasing agreements reached with Bay Meadows and Golden Gate Fields, the moment these agreements were reached, Tanforan's racetrack assets were of absolutely no value to anyone, much less to Tanforan.

These factors, together with the approval of the freeway route which would render much of Tanforan's prime south parking lot unusable, each of which is established by uncontroverted evidence, make it plain that Tanforan's racing assets became obsolete during 1963 and

that at the end of the year such assets (with the exception of the Administration Building and the warehouse-shop) had no remaining useful life to Tanforan. Accordingly, the deduction of the undepreciated cost of these assets is proper as an obsolescence deduction under the express provisions of said Treasury Regulations, Section 1.167(a)–9.

Furthermore, and alternatively, the deductions made in 1963 are allowable since the track was permanently retired from use in Tanforan's trade or business in 1963. This alternative ground for deduction is supported essentially by the same facts which establish the allowability of Tanforan's deduction in 1963 on the ground of obsolescence. Allowance of the deduction as a "retirement" is amply supported by the clear and unambiguous provisions of Treasury Regulations, Section 1.167(a)–8(a) (3), which reads in part as follows:

"Where an asset is permanently retired from use in a trade or business or in the production of income but is not disposed of by the taxpayer or physically abandoned (as, for example, when the asset is transferred to a supplies or scrap account) * * * loss will be recognized measured by the excess of the adjusted basis of the asset at the time or retirement over the estimated salvage value or over the fair market value at the time of such retirement if greater, but only if (i) the retirement is an abnormal retirement. * * * "

In determining whether a retirement is "abnormal," Treasury Regulations, Section 1.167(a)–8(b) is of some assistance:

"For the purpose of this section the determination of whether a retirement is normal or abnormal shall be made in the light of all the facts and circumstances. In general, a retirement shall be considered a normal retirement unless the taxpayer can show that the withdrawal of the asset was due to a cause not contemplated in setting the applicable depreciation rate.

For example, a retirement is considered normal if made with the range of years taken into consideration in fixing the depreciation rate and if the asset has reached a condition at which, in the normal course of events, the taxpayer customarily retires similar assets from use in his business. On the other hand, a retirement may be abnormal if the asset is withdrawn at an earlier time or under other circumstances, as, for example, when the asset has been damaged by casualty or has lost its usefulness suddenly as the result of extraordinary obsolescence."

█ The touchstone of the rule is that the retirement of the asset be "abnormal." And under the regulations a retirement is "abnormal" if the taxpayer can establish either that "the withdrawal of the asset was due to a cause not contemplated in setting the applicable depreciation rate" or that it resulted from "extraordinary obsolescence." Both of these independent factors are present here. As the facts above discussed disclose, the pivotal events leading to the termination of the usefulness to Tanforan of the assets in question all arose in 1963. They could not have been reasonably anticipated prior thereto. Indeed, it was the defendant who early in 1963 insisted on increasing the useful lives of the buildings to 18 years and of the improvements to ten years; these lives could hardly take into account the events which transpired later in 1963 and which led ultimately to the retirement in that year of the racetrack assets.

Finally, and again alternatively, the deduction is allowable under established principles relating to losses from the physical abandonment of assets.

█ Traditionally, the loss for physical abandonment has been based on evidence establishing an intent to abandon the asset coupled with some overt act or identifiable event to which the abandonment can be related. As stated by the court in United California Bank v. Commissioner of Internal Revenue, 41

T.C. 437, 451 (1964), aff'd per curiam, 340 F.2d 320 (9th Cir. 1964):

"In order to establish actual physical abandonment, there must be an intention on the part of the owner to abandon the property coupled with an act of abandonment, both to be ascertained from all facts and surrounding circumstances."

"Abandonments" are also reflected in Treasury Regulations, Section 1.167(a)–8(a)(4), which provides in part as follows:

"Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will be neither used again by him nor retrieved by him for sale, exchange, or other disposition."

In the present case, the existence of the intention to abandon in 1963 and the overt acts consistent with that intention are unmistakable. There is in this case substantial evidence of the intention on the part of Tanforan to abandon its racetrack assets at the end of 1963; there is also considerable evidence from which Tanforan's intention to abandon is the inescapable inference. The most significant facts from which an intention to abandon can be inferred are the enactment of the 1963 legislation enabling Tanforan to race its days at the other two Northern California tracks (Bay Meadows and Golden Gate Fields) and the subsequent negotiation of the lease agreements with the other two tracks. A number of still other factors which support the intention to abandon are:

1. In December, 1963, the Tanforan board of directors was mindful of the fact that it was becoming increasingly difficult to generate a fair return on the shareholders' investment while at the same time adequately maintaining, much less improving, its physical plant.

2. The board of directors was also aware in December of 1963 that the State of California had adopted a freeway route which would at a subsequent time eliminate approximately 50 per cent of Tanforan's prime parking lot.

3. In December of 1963, Tanforan's directors had been advised that major repairs and improvements would be required if racing was to be continued at Tanforan in the future.

4. On November 18, 1963, Tanforan incorporated a wholly-owned subsidiary, Tanforan Racing Association, to conduct future racing operations and thereby to separate the operation of racing from the ownership of a racetrack.

5. On December 13, 1963, Tanforan assigned to its subsidiary, Tanforan Racing Association, all of its tangible personal property used in connection with its racing operations.

6. On December 16, 1963, Tanforan joined with Pacific Turf Club and California Jockey Club in a letter to the Horse Racing Board requesting permission to run all 1964 Northern California thoroughbred meets at the Golden Gate Fields and Bay Meadows tracks.

7. Tanforan's directors, at a meeting held on December 19, 1963, formally resolved to discontinue racing operations at the Tanforan track, and to abandon its racing assets.

8. On December 27, 1963, Tanforan caused its subsidiary, Tanforan Racing Association, to send a letter application to the Horse Racing Board requesting permission to race the days allotted to Tanforan in 1964 on a lease basis at Golden Gate Fields and Bay Meadows.

9. Tanforan's entire maintenance crew was discharged before the end of 1963, and at the December 19, 1963 meeting termination pay for Tanforan's plant superintendent was authorized by the directors.

10. No maintenance work was done on Tanforan's facilities after the close

of its 1963 racing meet on October 30, 1963.

11. Tanforan's books contain an entry reflecting the write-off of its racing assets as of the end of 1963.

12. By the end of 1963 it was generally known by the public and it had appeared in the press that Tanforan would no longer conduct racing meets at its track.

13. After October 30, 1963, no race meets were, in fact, conducted at the Tanforan track, and no further use was ever made of the track.

Such evidence adequately establishes that Tanforan intended to abandon its track at December 31, 1963.

The court, too, is satisfied that there are sufficient objective facts in this case to satisfy the second requirement for the abandonment deduction, namely, that there be an act of abandonment. Many of the facts discussed above evidencing an intent to abandon are themselves objective acts of abandonment. The entering into lease agreements and the joint letter to the Horse Racing Board committing Tanforan to a program of racing at other tracks are unquestionably acts of abandonment of the Tanforan track. The assignment by Tanforan to its subsidiary, Tanforan Racing Association, of all of its tangible personal property used in connection with racing; the resolution of the board of directors at the December 19, 1963 meeting; the actual discontinuance of the use of the racetrack, buildings and improvements; the discharge of the maintenance crew; and the termination pay vote for the plant superintendent are each acts of abandonment. The only other act which Tanforan could have undertaken to show its intent to abandon would have been to demolish the buildings, an act recognized as unnecessary to support a deduction for abandonment. See Hummel v. United States, 227 F. Supp. 30 (N.D.Cal.1963); Minneapolis, St. Paul & Sault St. Marie Ry. Co. v. Commissioner of Internal Revenue, 34 B.T.A. 177, 185 (1936).

Based on the foregoing, the deductions made in 1963 are separately allowable as an abandonment loss.

*Sale of Land to Sunset.*

The sale of the land to Sunset International Petroleum (hereinafter referred to as "Sunset") was entirely independent of Tanforan's decision to discontinue racing at its track and in no way precludes allowability of the deduction in 1963. It is apparent both from the administrative proceedings in this case and from the trial that the defendant relies heavily on the fact that Tanforan's land was sold to Sunset in March of 1964. Defendant appears to be arguing that the loss resulted not from the termination of the track's useful life to Tanforan, but rather from the sale of the land to Sunset. This argument is bottomed on the erroneous premise that Tanforan was operating its track in a normal manner in 1963 and would have continued to operate it in the same manner except for the fact that on one summer day in 1963 Sunset expressed an interest in purchasing the Tanforan land. Unless the sale caused the obsolescence, the retirement, and the abandonment of the racetrack assets, the occurrence of the sale hardly solves the government's difficulties in making out a case. The evidence shows that the sale was a fortuitous event and that obsolescence, retirement and abandonment would have occurred in 1963, even if Tanforan had never heard of Sunset. It is clear that the land became available for sale only *after* the racetrack assets were no longer useful to Tanforan.

It is also clear that Sunset did not pay and Tanforan did not receive any part of the sale price for the depreciable racetrack assets when the land was sold to Sunset in 1964. The evidence establishes that Sunset was not interested in acquiring the racetrack assets and at no time intended to conduct racing at the old Tanforan track. The defendant did not seriously dispute this fact since it agrees that the racetrack assets had no salvage value at December

31, 1963, and that the cost of demolition would have exceeded any sales proceeds from those assets.

If Tanforan had continued to hold the land for other investment or subdivision purposes instead of selling it to Sunset, Tanforan unquestionably would be allowed the deduction in 1963 since it would be entitled to recover the cost less salvage value (in this case, "zero", Stipulation No. 40) of the assets involved when they were no longer being used in the business. Treas.Reg. § 1.167(a)–8. A fortuitous sale of the land after termination of the use of the depreciable assets as a racing plant should not change the result. Tanforan at no time solicited offers from any person to purchase its land; Tanforan's land was never listed for sale formally or informally with any broker; and no officer or agent of Tanforan was authorized to list any part of its property for sale or to negotiate with anyone for the sale of any part of its property. Until Sunset's offer was received late in 1963, Tanforan's directors uniformly rejected all inquiries and affirmatively indicated they were not interested in discussing the sale of all or any portion of its land with anybody.

As with others, Sunset's interest in the property was unsolicited by any representative or agent of Tanforan. When Sunset first expressed interest in Tanforan's property in the summer of 1963, it was advised by Tanforan that the property was not for sale. Nevertheless, Sunset, on September 19, 1963, submitted an offer through Coldwell, Banker and Company for purchase of the property. On September 23, 1963, Tanforan's general manager advised Tanforan's directors of Sunset's interest and was instructed not to pursue the Sunset sale further. Two days later Sunset was advised by Coldwell, Banker and Company that Tanforan was not interested in its offer. No meetings between Tanforan and Sunset representatives were held until after the end of Tanforan's fall horse racing meet. On November 5, 1963, the first meeting between the parties was arranged at the request of Sunset. Negotiations between Sunset and Tanforan and exchanges of drafts continued during the period from November 26, 1963, to early March, 1964. Basic changes in the terms covering such matters as the amount of the down payment, the due date of the deferred balance of the purchase price, and the payment of interest, were made as late as February of 1964 at the request of Sunset. At the time the useful life to Tanforan of its racing plant terminated, not only had the agreement not been authorized by either party or consummated but the details of the transaction had not even been settled by the parties.

Some of Tanforan's directors expressed continued opposition to any sale, even as late as the board of directors' meeting on March 7, 1964. The economic absolescence of the racetrack and Tanforan's 1963 decision to abandon or retire from use the assets in question would have taken place whether or not any offer for purchase had been received from Sunset or any other party. The evidence discloses that several directors stated that they favored holding the land for investment or development by Tanforan after racing was discontinued at the track. Until the board of directors' meeting of March 7, 1964, those connected with Tanforan were uncertain whether the sale to Sunset would ever be authorized. At the March 7, 1964 meeting the reluctant directors acceded to the sale largely because they had no alternative plan to offer, and the sale was approved. The purchase of Tanforan's land was not even authorized by Sunset's board of directors until February 20, 1964. There was no binding or unconditional obligation of either Sunset or Tanforan until the sale agreement was signed in March, 1964. The sale was actually consummated on March 10, 1964.

Thus neither Sunset's interest in Tanforan's land nor its offer to purchase the land caused the obsolescence, abandonment or retirement which gave rise to the deduction from income which is involved

in this case. Rather, the obsolescence, retirement and abandonment of the racetrack assets were the result of the facts discussed earlier resulting in the termination of racing at Tanforan. Tanforan's directors would have ended racing at Tanforan's track at the end of the fall meet in October of 1963 even if Sunset had never expressed an interest in or made an offer for Tanforan's land.

If anything can be said of the significance of the sale, the conclusion is inescapable that the factors causing termination of the useful life of the racetrack led to the Sunset sale rather than that the sale led to the abandonment of racing. Once racing was ended at the Tanforan track, the company obviously had a disposable asset—its land—which it had a duty to its stockholders to sell, develop, or hold for appreciation. It chose to sell because of lack of any other concrete plan. Its choice to sell should not result in a different conclusion than if one of the other alternatives had been adopted.

Since it was not the sale to Sunset that caused the loss of useful life of the Tanforan racetrack assets, the sale is irrelevant to the issue in this case. Many decisions have allowed a deduction for a loss or for depreciation where the property involved was subsequently sold. See, e. g., Industrial Cotton Mills Co., Inc., 43 B.T.A. 107 (1940); Keller Street Development Co. v. Commissioner of Internal Revenue, 323 F.2d 166 (9th Cir. 1963); Rhodes v. Commissioner of Internal Revenue, 100 F.2d 966 (6th Cir. 1939); Moise v. Burnet, 52 F.2d 1071 (9th Cir. 1931); S.S. White Dental Mfg. Co. v. United States, 55 F.Supp. 117, 102

Ct.Cl. 115 (1944); Monroe Cotton Mills, 6 B.T.A. 172 (1927); Cf. Feldman v. Wood, 335 F.2d 264 (9th Cir. 1964); Ford v. United States, 20 A.F.T.R.2d 5031, 67–2 U.S.T.C. 9546 (W.D.Ky.1967).

In summary, since the evidence clearly establishes that the useful life of the racetrack assets ended on termination of racing at Tanforan, and not as a result of any sale or decision to sell to Sunset, the sale of the land is immaterial. A subsequent lease of the land, or any other disposition of the land, would have been equally immaterial. The fact remains that whether or not Tanforan sold or otherwise disposed of its land, it has never recovered, in terms of sale proceeds, the cost of its investment in its *depreciable* assets. If the deduction in this case were disallowed, Tanforan would also be denied the recovery of its investment by means of a deduction against ordinary income, thereby frustrating the very purpose of the allowance for depreciation. No such result was intended by Congress or required by the Treasury Department's own regulations or by the decided cases.

For the reasons hereinabove stated and to the degree hereinabove indicated, plaintiff properly deducted on its 1963 income tax return the undepreciated cost of the racetrack buildings, land improvements and equipment as of December 31, 1963, and is granted judgment in its favor accordingly. Plaintiff is directed to prepare and submit findings of fact and conclusions of law in accordance with the foregoing. Form of judgment will also be submitted.

## APPENDIX "A"

### ASSUMPTIONS

Value of tangible assets

1.  Buildings
    Winslow Hall appraisal of buildings

| | |
|---|---|
| (RCN) | $2,574,320 |
| Plus bus shelter (omitted) | 1,680 |
| | 2,576,000 |
| Plus ins. exclusions (9%) | 231,840 |
| Total | 2,807,840 |

Less Vaughan depreciation
(physical, functional and
economic—composite rate
of 60%)                                                    1,684,704

1959 Value                                                                      $1,123,136

2.  Land Improvements

Vaughan (RCN)                                         709,500
Less Vaughan depreciation
(physical, functional and
economic—composite rate
of 40%)                                                     283,800

1959 Value                                                                        425,700

3.  Equipment—stipulated value at 1959                            125,000

          Total 1959 Value of Tangible Assets              $1,673,836

12-year life for Buildings, Land
   Improvements and Equipment          8.3%  recapture rate
Land Value in 1959 (stipulated)                     $3,200,000

Return

   Land                                   7%
   Buildings, land improve-
      ments and equipment        15%

Stabilized Net Income—$700,000

/ / /
/ / /
/ / /
/ / /
/ / /

### CALCULATIONS

Stabilized Net Income                          $700,000

Return on land
   $3,200,000 at 7%*                            (224,000)

Return and recapture on buildings,
   land improvements and equipment
   (8.3% + 15%* = 23.3%)
   23.3% of $1,673,836                         (390,004)

Return on working capital
   $300,000 at 15%*                              (45,000)
   Residual income                            $  40,996

Capitalization with Inwood
   coefficient of 3.725                         $152,710

* Overall rate of return    9.75%