Superior Coal Company v. Commissioner.
Superior Coal Co. v. Commissioner
Docket No. 110137.
United States Tax Court
1943 Tax Ct. Memo LEXIS 54; 2 T.C.M. (CCH) 984; T.C.M. (RIA) 43482; November 13, 1943
*54 Nelson S. Trottman, Esq., 400 W. Madison St., Chicago, Ill., for the petitioner. Harold H. Hart, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined a deficiency in the income tax of petitioner for the calendar year 1939 in the amount of $40,959.67. The sole issue is - Did the petitioner sustain a deductible loss during the calendar year 1939 with respect to subsurface coal lands situated in Monroe County, Iowa, to which it held title? Other assignments of error contained in the petition have been disposed of by stipulation. Effect will be given to the stipulation in the settlement under Rule 50. Findings of Fact Petitioner, an Illinois corporation, with offices in Chicago, Illinois, is a wholly owned subsidiary of the Chicago and North Western Railway Company. Since its incorporation, it has engaged in the coal mining business, selling its entire output to the Chicago and North Western Railway Company, with the exception of a small amount which it sold to its mining employees. In the corporation income and excess profits tax return filed by petitioner for the calendar year 1939, it claimed a deduction, on line *55 23 thereof, of $104,893.62, stating in an attached schedule that the loss claimed was from "abandonment of all Iowa coal lands - cost less depletion." The coal lands with respect to which the loss was claimed are situated in Monroe County, Iowa. Petitioner holds record title to the mineral rights in said lands, but does not own the surface rights. The adjusted basis in 1939 of the rights owned by it and in respect to which it claimed the loss of $104,893.62 was $71,800.34. Prior to March 31, 1927, the petitioner mined coal from the lands in question, having two mines (Mine 18 and Mine 19) fully equipped and in operation on the premises. Operations at said mines were abandoned on March 31, 1927, and since that date no coal has been removed from the properties by petitioner or by any one else under its authority. The mining operations at Mines 18 and 19 were abandoned because petitioner could mine coal from coal lands which it owned in Illinois and move it beyond the Iowa mines much cheaper than it could mine the Iowa coal and move it to the same points. The Illinois coal was also superior in quality to the Iowa coal. In 1929 petitioner sold the power plant, tipples, machinery, cars *56 and all other equipment which could be dismantled and removed from Mines 18 and 19. The equipment was dismantled and removed by the vendees by the early part of 1931. After abandoning mining operations in March of 1927 and selling the equipment of the mines in 1929, petitioner intended never again to operate such mines. The parent company, the Chicago and North Western Railway Company, in order to serve Mines 18 and 19, prior to 1935 operated a branch line from Belle Plaine, Iowa, a station on its main line, through What Cheer to Consol, Iowa. This branch line was about 35 miles in length. In 1937, the Interstate Commerce Commission authorized the discontinuance of railroad service on this branch line. The tracks were completely removed in 1935. No other railroad served Mines 18 and 19. The Chicago, Burlington and Quincy Railroad serves the station of Melrose, which is about six miles from Mines 18 and 19. Title to the sub-surface coal lands with respect to which the loss was claimed was acquired by petitioner from the Consolidation Coal Company, a wholly owned subsidiary of the Chicago and North Western Railway Company, prior to 1927. Petitioner paid all tax imposed with respect *57 to such lands by the State of Iowa, or its subdivisions, up to the year 1938. The taxes for the first half of 1938 were due and payable in March, 1939. After consultation between the trustee of the parent company and officers of the petitioner it was decided, in 1939, that the taxes due for the second half of 1938 and subsequent periods would not be paid. Petitioner did not divest itself of title during the calendar year 1939 to the properties with respect to which the loss was claimed and title to such properties remained in it in subsequent years. Petitioner, after abandoning its coal operations at Mines 18 and 19 for economic reasons in 1927, had only a remote hope thereafter that someone could be interested in buying the coal rights. Petitioner's president made some efforts to interest outside parties in the properties, but they were fruitless and no purchaser was ever found. The properties with respect to which the loss in question was claimed became worthless prior to 1939. Opinion Our last finding is dispositive of the sole issue, which, as stated at the outset, is whether petitioner's investment in the coal rights in Mines 18 and 19, in Monroe County, Iowa, became worthless *58 during the taxable year. Some discussion of the contentions of the parties and the evidence upon which this finding is based may not be amiss. The petitioner contends that it abandoned the coal rights in 1939 and sustained a loss, irrespective of the fact that there was no formal divestiture of title during that year, and that prior to 1939 it attempted to sell the coal rights, which then possessed potential value, but in 1939 terminated its selling efforts and rightly determined the rights to be worthless. The respondent contends: (1) that petitioner is not entitled to the claimed deduction because there was no divestiture of title during 1939; (2) that prior to 1929 the coal lands were permanently discarded by petitioner and the deduction, if allowable prior to divestiture of title, should have been claimed by it in the year during which loss of useful value occurred, and (3) that the coal lands, in any event, were worthless prior to January 1, 1939. It is well-settled that the retention of the bare legal title to property does not prevent a taxpayer from taking a deduction in the year in which the property becomes worthless. , *59 affirmed . It is equally well-settled that a taxpayer may not be permitted to postpone the taking of a deduction for a loss actually sustained until a year in which the deduction will result in a larger saving in tax. Passing, then, the first contention and argument of each of the parties we come at once to what we conceive to be the real issue: Did the property in issue become worthless during the year 1939? We have found that it became worthless prior to that year. Briefly summarizing our findings petitioner on March 31, 1927 abandoned its mining operations at Mines 18 and 19. Thereafter it had no intention of ever resuming its mining operations there and never mined another ton of coal from the premises. In 1929 it sold the power plant, the tipple, and all other mining machinery and equipment, and this equipment was taken away by the purchaser by the early part of 1931. In 1935 the Interstate Commerce Commission authorized the removal of tracks on the branch line serving the mines and the removal was completed in the early part of 1937. Petitioner attempts to justify the postponement of the deduction of the *60 loss upon its investment in the mines until 1939 on the grounds that its president, even after it had ceased operations and sold all the mining equipment, had some remote hope that he would find somebody to buy the coal rights and re-establish the mines. The president testified at length before us. He stated that he made many trips to Iowa and talked to many people, especially men operating coal mines in Monroe County, attempting to interest them in the purchase of the coal rights. According to his testimony one of the coal mine operators finally told him that he would not take the coal rights as a gift, and he then gave up any hopes of being able to sell them. That, he stated, "was around, I believe 1938, that would be my guess, or it might have been early in 1939, when I began to get that tone from operators in that territory * * *." He also testified as follows: When we sold the top works, as I call it, of these two mines in 1929, I then proceeded to try to interest the operators in the purchase of the coal rights; and I think it is a fair statement that I made ten or twelve trips a year out there in the early days, later not so many. All during that period I did try to interest *61 the operators. Finally in 1938, or early in 1939, when George Heaps told me there was no use of trying to waste any of his time in trying to sell those coal rights, because he would not take them if they were given to him, I think that was the final end of my efforts to try and sell those coal rights at any price. Later the witness stated that his final conversation with Heaps, in which the latter told him he would not take the coal rights as a gift, was in the spring or summer of 1939. In an affidavit, introduced in evidence by petitioner, George E. Heaps stated, among other things: The mines near Buxton at one time produced approximately 1,000 tons per day each of coal, most of which was sold to the Chicago and North Western Railway Company. Shortly after the termination of Federal Control in 1920 that Railway discontinued buying coal from these mines near Buxton. On this account it was impossible to operate these mines profitably, because there was no market for the coal, and in the first half of the decade from 1920 to 1930 all of these mines were abandoned. The coal rights connected with these mines became worthless prior to such abandonment and in my opinion have been worthless *62 ever since. I have known Mr. Fred Pfahler for many years and on numerous occasions between 1929 and 1939 said Pfahler discussed with me the Superior Coal Company mines near Consol, known as mines 18 and 19. Said Pfahler on a number of occasions asked me to purchase the coal rights appertaining to mines 18 and 19. I refused to purchase these rights at any price whatever, for the reason that in my opinion such coal rights were worthless; and on a number of occasions I stated to said Pfahler that I would not take said coal rights as a gift. In my opinion said coal rights were worthless prior to 1939, during the entire year of 1939, and are still worthless. On cross examination Pfahler testified as follows: Q. What happened in 1939 to make you conclude that they [the coal rights] were not worth a dollar? A. Well, I had been told point blank and in very plain words by an operator whom I had confidence in that he would not take them as a gift. Q. Who was that? A. George Heaps. Q. Would he have taken them as a gift in 1938? A. I am inclined to think he would, yes. Q. Were the facts with reference to this coal the same in 1938 as they were in 1939? Did any event happen between January *63 1, 1938 and the spring of 1939 to make your coal lands valueless? A. As far as I was concerned, there was no refusal to consider the coal rights until 1939, in the spring or the early summer. Q. Did you ever have an offer from anyone to buy them in 1938? A. I would not say that I did, I don't recall anybody making an offer, an outright offer at any time, because I think I would probably have grabbed a reasonable offer in the late years. Q. From 1929 to 1939 no one ever made an offer to buy these lands? A. Not an outright offer; no, sir. Q. At any price? A. No, sir; we did not get to that point. The evidence discloses the reasons underlying the lack of success attending Pfahler's efforts. Iowa coal is low grade, high in ash and sulphur, and low in heat units. Iowa mines are high-cost mines due to very bad roof conditions requiring heavy timbering. There is only one "strip mine" in Iowa, it being located near Des Moines. The cost of mining coal at Mines 18 and 19 before operations were discontinued was $2.85 a ton, which was approximately three times the cost of mining coal in Illinois. There was no market in Monroe County for this coal. Practically all the coal mines in that *64 county, including those of petitioner, ceased operations between 1920 and 1930, one of the exceptions being a small mine serving Albia, a community of 5,000 inhabitants. This was due to the fact that it was possible to ship better-grade Illinois coal to Iowa and sell it at a price lower than Iowa coal could be profitably sold. The inability of Iowa coal to compete with Illinois coal was not, however, the only factor which discouraged prospective investors from investing in the coal rights appertaining to mines 18 and 19. According to petitioner's president, after it sold the mining equipment in 1929, any person considering the purchase of the coal rights and desiring to produce coal would face an expenditure of approximately $250,000 for a power plant, tipples, and other mining equipment and an expenditure of around $300,000 for each mine if they were mechanized. This witness admitted that if these properties (Mines 18 and 19) had not belonged to petitioner in 1935, and someone had tried to get the railroad company to purchase them, that he would not have recommended their purchase "because the Illinois coal was cheaper." One coal operator, in 1935 or 1936, before the rails were removed, *65 was offered the coal rights at his own price, but turned down the offer. This evidence, all of which was introduced by petitioner, does not convince us that petitioner's investment in the coal rights became worthless during the year 1939. Nothing that happened in that year altered in any way the value of the coal rights. It is apparent from the affidavit of Heaps that any statement he may have made in 1939 to the effect that he would not take the rights as a gift was merely the repetition of similar statements made theretofore, and it is obvious that no doubt existed in his mind that the coal rights were worthless prior to 1939. The events which transpired prior to the taxable year were in our judgment sufficient to convince a reasonably prudent man that the coal rights were worthless. If petitioner and its parent, after discontinuing the operation of the mining properties in 1927, had any thought that the coal rights could be sold, they would hardly have sold the coal mining equipment in 1929, and removed the only tracks serving the mines between 1935 and 1937. Our best judgment therefore is that the coal rights became worthless prior to 1939, that petitioner then sustained the *66 loss it seeks to deduct in computing its net income for 1939, and that the Commissioner committed no error in denying the claimed deduction. Decision will be entered under Rule 50.