**A. J. INDUSTRIES, INC.,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**No. 72–2760.**

United States Court of Appeals,
Ninth Circuit.

Sept. 12, 1974.

Jack R. White (argued), of Hill, Farrer & Burrill, Los Angeles, Cal., for plaintiff-appellant.

Ernest J. Brown (argued), U. S. Dept. of Justice, Washington, D. C., for defendant-appellee.

Before ELY and CARTER, Circuit Judges, and EAST,* District Judge.

## OPINION

JAMES M. CARTER, Circuit Judge:

In this tax case, plaintiff taxpayer appeals from a district court judgment denying it a refund for taxes and interest paid in the sum of $1,291,445.79 for the taxable years 1957 through 1961. The central question is whether taxpayer is entitled to a loss deduction under either the 1939 or 1954 Internal Revenue Codes and applicable regulations for the years 1956 or 1957, in connection with an abandoned gold mining venture in Juneau, Alaska.

On its return in 1958, taxpayer claimed a loss deduction which it carried back to 1957 and carried forward through 1961 in order to reduce taxes in those five years. The Commissioner of Internal Revenue disallowed the deduction, assessing a deficiency. Taxpayer paid the deficiency and filed a suit for refund in the United States Court of Claims, claiming a deduction for a loss in 1958. The Court of Claims ruled that the loss had occurred sometime prior to 1958, and thus denied the claim. A. J. Industries, Inc. v. United States, 388 F. 2d 701, 181 Ct.Cl. 1017 (1967).

Taxpayer then brought this action in the district court for a refund, claiming that the loss occurred in 1956 or 1957. It is not disputed that plaintiff, following the Court of Claims' decision regarding the year 1958, had a right to bring another action claiming that the loss occurred in earlier years. Nor is it disputed that, if the loss occurred prior to 1956, the loss deduction was barred by the applicable statute of limitations.

The district court, ruling that the loss occurred prior to 1956, denied the refund. The question on appeal is whether the district court applied the proper criterion under the Regulations and case law in determining when the loss occurred.

There is no dispute as to facts—the case was tried on a stipulated record. The taxpayer does not challenge the findings of fact but only the conclusions of law and the judgment of the district court.

In the district court, the government disputed the amount of loss claimed, $2,028,515, but conceded at least $1,158,622 would be deductible if plaintiff was entitled to claim a loss. The question of the proper amount of the claimed loss was not reached by the district court and is not before us. However, we should note that there was no claim by the government that the claimed amount of loss was fictitious or false or in any other way not a legitimate claim except for its proper calculation under the facts and the law.

## THE SPECIFIC QUESTIONS RAISED

(1) Did the district court disregard Treasury Regulation 118, § 39.23(e)–3, 1939 Code?

(2) Did the district court erroneously rely on Boehn v. Commissioner, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1945)?

## THE FACTS

The facts, which are not in dispute, are set forth in detail in the findings of the Commissioner in A. J. Industries, Inc. v. United States, 388 F.2d 701, 181 Ct.Cl. 1017, 1035–1063, from which findings the stipulated pretrial order was prepared. Some of the findings of fact are set forth in footnotes to the subsequent text; particularly Findings 60, 65, 77 and 78.

In summary, the Alaska mine was a profitable gold mining venture from

---

* Honorable William G. East, Senior United States District Judge, District of Oregon, sitting by designation.

1897 until 1942. It lost money in 1943 and 1944, owing to higher wages brought about by the war. The War Labor Board ordered a 14-cent an hour retroactive increase in May 1944, and with increased costs for labor and material the taxpayer's president, pursuant to prior authorization for the board of directors, ordered a shutdown of the mine, which occurred in April 1944.

The taxpayer's management, believing until 1956 that the shutdown was temporary, were confident the mine could be reopened after the end of World War II. The management sought to protect the mining equipment, supplies and facilities, and to carry out repairs and reconstruction. They also engaged in exploratory work seeking new ore bodies in the mine, to the extent possible with a shutdown crew.

The shutdown force was composed of "key" men, primarily power plant employees, mine shaft bosses, crew foremen and heads of departments, who would be valuable on reopening. At the shutdown there were 44 such employees. Over the years the number of the crew decreased. At the end of 1955 there were 29. When the general manager retired in 1956 there were 22 or 23 men left.

In 1949 the taxpayer had spent $22,513.39 for shutdown expenses. In 1956 it spent $20,365.45 for the same purposes.

The old management, in control until mid-1956, believed the mine could eventually be again operated. As a result of a proxy fight, a new management took over in June 1956. They decided to abandon the mine and in 1956 gave an option for salvage of the machinery and equipment. In 1957 the option was exercised and a contract made for the salvage process. The money from the option and the contract was spent by the new management toward the purchase of an operating company, the Reynolds Mfg. Company.

It is important to note that the loss claimed is not for machinery or equipment or for diminution in value of the mine itself. It is instead for the adjusted basis of plaintiff's capitalized development costs in preparing the underground tunnels and workings of the mine.

While the mine was still in use, the method of extracting gold was the "caving" system, which required development work to prepare specific areas that could be "caved in" economically and safely. This required construction of tunnels and shafts, winzes and raises for the general purpose of hauling, drainage, ventilation and safety. The development costs which benefitted the entire mine were listed in the books as "Mine Development Costs," and the development costs in preparing specific areas for "cave ins" were listed as "Preparatory Mining Costs." Together they made up the capitalized amount for which the loss is claimed.

Thus the asset for which the loss is claimed is an intangible asset. It is not the mine or the real estate, and no question of legal title to the land is involved. It is an amount separable and identifiable from the land itself. It is not disputed that such intangible assets are capable of being discarded and abandoned by a taxpayer and are subject to a claim for a deductible loss.

## THE DISTRICT COURT'S CONCLUSIONS OF LAW

In its Conclusions of Law the district court held:

"6. In order to be entitled to a loss deduction as the result of the Juneau mine having become worthless, plaintiff has the burden of demonstrating, by a preponderance of the evidence, that the property had something of value at the beginning of the year for which the loss is claimed." Boehm v. Commissioner, 326 U.S. 287, 66 S.Ct. 120 (1945).

"7. Under the internal revenue laws a loss deduction must be recognized in the year in which the loss actually was sustained, irrespective of the subjective recognition or predispositions of a taxpayer's management. Boehm v. Commissioner, *supra*; A. J. Indus-

tries, Inc. v. United States, 388 F.2d 701, 181 Ct.Cl. 1017 (1967).

"8. Worthlessness of a mine is established when there no longer are any reasonable prospects for producing the ore in commercially profitable quantities.

"9. The facts and circumstances existing with respect to the Juneau mine during the period 1944–1956 were such that the management did not exercise reasonable business prudence in failing to formally recognize that the mine would never again produce commercially profitable gold ore.

"10. Under the applicable statutes, regulations (relating either to the 1939 or 1954 Internal Revenue Code), and case law, the Court concludes that plaintiff's loss was not sustained in either of the taxable years for which it was claimed and that no loss occurred to plaintiff in either 1956 or 1957."

### DISCUSSION

In this particular case the government concedes that the taxpayer is entitled to a refund if either the 1939 Code or the 1954 Code justifies a deduction. Both the 1954 Code, § 165(a) (26 U.S.C. § 165(a)) and the 1939 Code, § 23(f), allow a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise."

I. 1954 Internal Revenue Code.
"Reg. § 1.165–1 Losses
  (a) Allowance of deduction  .  .  .  .
  (b) Nature of loss allowable. To be allowable as a deduction under section 165(a), a *loss must be evidenced by closed and completed transactions, fixed by identifiable events,* and, except as otherwise provided in section 165(h) and § 1.165–11, relating to disaster losses, actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.
  (c) Amount deductible.  .  .  .
  (d) Year of deduction. (1) A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. For this purpose, a

### I.
#### *Loss Deductions Generally*

A loss is not sustained and is not deductible because of mere decline, diminution or shrinkage of the value of property, Reg. § 1.165–1(b) and (d), 1954 Code,[1] states that the loss is treated as sustained only when its occurrence is "evidenced by closed and completed transactions and is deductible during the taxable year fixed by identifiable events occurring in such taxable year." The case law so holds. Commissioner v. Peterman (9 Cir. 1941) 118 F.2d 973, 976; Monroe v. Beatty, 46 T.C. 835, 836 (1966); Citizens Bank of Weston, 28 T. C. 717 (1957).

The 1954 Code provides specific guidance for determining when certain kinds of losses occur. For example, a "theft loss" occurs by virtue of a theft and is deemed sustained and deductible when the Taxpayer discovers the theft. (§ 165(e).) A "disaster loss" occurs by virtue of a disaster and is accorded special treatment as to the year of deduction. (§ 165(h).) Losses on worthless securities (165(g)) and worthless debts (§ 166) are expressly sustained by virtue of the asset becoming "worthless" and are expressly made deductible in the year during which they become worthless.

However, neither the 1939 Code, § 23(f), nor the 1954 Code, § 165,[2] provide

loss shall be treated as sustained during the taxable year in which the *loss occurs as evidenced by closed and completed transaction and as fixed by identifiable events occurring in such taxable year.* For provisions relating to situations where a loss attributable to a disaster will be treated as sustained in the taxable year immediately preceding the taxable year in which the disaster actually occurred, see section 165(h) and § 1.165–11.
  (e) Limitation on loss of individuals.  .  .  . " (Emphasis added).

2. Section 165(a), 1954 Internal Revenue Code (26 U.S.C. § 165(a)):
  "(a) General rules.—There shall be allowed as a deduction any loss sustained

any guidance with respect to permissible deductions for the loss of a business asset such as capitalized development costs. We must therefore look to applicable regulations and case law.

## II.

*Treasury Regulation 118, § 39.23(e)–3 (1939 Code)*

The pertinent part of Treasury Regulation 118, § 39.23(e)–3 (1939 Code) is set forth in the margin.[3] The district court quoted Treasury Regulation 111, § 29.23(e)–1 (1939 Code), in its Conclusion of Law No. 5. That regulation reads identically with Treasury Regulation 118, § 39.23(e)–3 (1939 Code). Both were promulgated under the 1939 Internal Revenue Code.[4] The district court correctly found in Conclusion of Law No. 3 that Treasury Regulation § 1.165–1(d)(4)[5] (1954 Code) allows a taxpayer the option of applying either the regulations under the 1939 Code or the 1954 Code to losses occurring on or before January 16, 1960. The government concedes this is correct. The analogous regulation under the 1954 Code, § 1.165–2(a), is set forth in the margin.[6]

---

during the taxable year and not compensated for by insurance or otherwise.
  (b) Amount of deduction.—. . . .
  (c) Limitation on losses of individuals.— . . . .
  (d) Wagering losses.—. . . .
  (e) Theft losses.—. . . .
  (f) Capital losses.—Losses from sales or exchanges of capital. . . .
  (g) Worthless securities.—. . . ."

3. "Treas. Reg. 118, Sec. 39.23(e)–3. LOSS OF USEFUL VALUE.—
  (a) When, through some change in business conditions, the usefulness in the business of some or all of the assets is suddenly terminated, so that *the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action* the difference between the basis [adjusted] and the salvage value of the property. This exception to the rule requiring a sale or other disposition of property in order to establish a loss *requires proof of some unforeseen cause by reason of which the property has been prematurely discarded,* as, for example, where an increase in the cost or change in the manufacture of any product makes it necessary to abandon such manufacture, to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. This exception does not extend to a case where the useful life of property terminates solely as the result of those gradual processes for which depreciation allowances are authorized. It does not apply to inventories. The exception applies to buildings only when they are permanently abandoned or permanently devoted to a radically different use, and to machinery only when its use as such is permanently abandoned. . . ." (Emphasis added).

4. Treasury Regulation 111, § 29.23(e)–1, is the identical predecessor to Treasury Regulation 118, § 39.23(e)–3. Both were promulgated under the 1939 Code. Regulation 118, part 39, was promulgated September 26, 1953, and was made applicable to years beginning after December 31, 1951, superseding Regulation 111, part 29, as to such years. (Regulation 118, 18 F.R. 5771.)

5. Reg. § 1.165–1(d)(4) (1954 Code) :
  "(4) The rules of this paragraph are applicable with respect to a casualty or other event which may result in a loss and which occurs after . . . [January 16, 1960.] If the casualty or other event occurs on or before such date, a taxpayer may treat any loss resulting therefrom in accordance with the rules then applicable, or, if he so desires, in accordance with the provisions of this paragraph; but no provision of this paragraph shall be construed to permit a deduction of the same loss or any part thereof in more than one taxable year or to extend the period of limitations within which a claim for credit or refund may be filed under section 6511."

6. Treasury Regulations on Income Tax (1954 Code) 26 C.F.R.—
  "Reg. Sec. 1.165–2. OBSOLESENCE OF NON–DEPRECIABLE PROPERTY.—
  (a) ALLOWANCE OF DEDUCTION. A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any non-depreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under Section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable

■ Conclusion of Law No. 8 reads as follows: "Worthlessness of the mine is established when there no longer are any reasonable prospects for producing the ore in commercially profitable quantities." In this Conclusion, the district court used the wrong standard.

Section 165(g)(1) of the 1954 Code (26 U.S.C. § 165(g)(1)) expressly sets the standard of "worthlessness" for taking a loss for *securities*. In § 166(a)(1) of the 1954 Code (26 U.S.C. § 166(a)(1)), the same standard is set for *bad debts*.

But neither Treasury Regulation 118, § 39.23(e)–3 (1939 Code), or Treasury Regulations 1.165–1 and 1.165–2 (1954 Code), applicable to the loss of useful value of an asset used in a trade or business, mentions worthlessness or sets that as a standard. Regulation 118, § 39.-23(e)–3 (1939 Code) speaks of a situation where the taxpayer "discontinues the business or discards such assets permanently from use in such business," and states that the loss may be claimed in the year in which "he [the taxpayer] takes such action."

Regulation § 1.165–1(b) (1954 Code), in defining the nature of the loss, states, "a loss must be evidenced by closed and completed transactions, fixed by identifiable events. . . ." Regulation § 1.165(d) (1954 Code), in fixing the year in which the loss occurs, uses the same language but adding after " . . . fixed by identifiable events" the words

year in which the overt act of abandonment, or the loss of title to the property, occurs."

Regulation § 1.165–2(a) (1954 Code) was cited in the district court's Conclusion of Law No. 3. It adopted, in the second sentence, the previously unstated exception based on the "Real Estate Cases," *supra*, that delayed formal abandonment or loss of title do not prevent a loss from being sustained with respect to worthless *real estate*, where there has been a *de facto* abandonment coupled with an intent to permanently discard property recognized by the taxpayer *to be of no further value.* That sentence is broad enough to cover the exception referred to, *supra*, that a taxpayer may not delay taking a loss that has actually occurred in order to receive more favorable

"occurring in such taxable year." Neither the 1939 nor 1954 Regulations are considered in the district court's conclusions, although there is a general reference to the 1939 and 1954 Regulations in Conclusion No. 10.

S. S. White Dental Mfg. Co. v. United States (1944) 55 F.Supp. 117, 102 Ct.Cl. 115, discusses a regulation under the Revenue Act of 1936, Treasury Regulation 94, Art. 23(c)–3, identical to Regulation 39.23(e)–3, and states at p. 121:

"We think the words 'change in business conditions' in the Regulations must mean, 'in the opinion of the managers of the business.' They cannot refer to anything more objective than that, since assets are discarded upon the basis of that opinion, and upon no other basis.

"The words 'the usefulness in the business of some or all of the capital assets is . . . terminated' must mean terminated in whole or in such part that, in the opinion of the managers of the business, good management calls for their being discarded. Practically never is a capital asset wholly useless when discarded. It is discarded when it becomes relatively uneconomical to continue to use it, when its use is considered in relation to one or more alternatives. This choice was here made by plaintiff's managers, and their action comes within the quoted language of the regulation." [6a]

tax treatment in a subsequent year. (See Footnote [6b]).

In any event the taxpayer need not rely on Regulation § 1.165–2(a), since he is given the right to rely on Regulation 118, § 39.-23(e)–3 by virtue of the terms of Regulation § 1.165–1(d)(4) (1954 Code).

**6a.** The word "suddenly" was also discussed by Judge Madden in S. S. White Dental Mfg. Co. v. United States (55 F.Supp. 117 at 121, 102 Ct.Cl. 115). The case concerned Treasury Regulation 94, Article 23(e)–3, but it read the same as Treasury Regulation 118, § 39.23(e)–3.

Judge Madden concluded, "We think that the word 'suddenly' in the regulation is satisfied, though it seems to us to be a rather inept word to express the apparent meaning of the regulation."

The government states that the Court of Claims rejected *S.S. White* in its decision in *A. J. Industries, Inc., supra* (388 F.2d at 710, 181 Ct.Cl. 1017) where it stated:

"But neither *S.S. White* nor *Hazeltine,* [170 F.Supp. 615, 145 Ct.Cl. 138] is authority for plaintiff's theory that the determination of which taxable year an asset became 'worthless' or 'loses its useful value' is *solely* within the discretion of the business judgment of management."

*S.S. White* did not use the word "solely" in its discussion of a management decision. Even so, the Court of Claims was wrong in holding that taxpayer could not rely on that case. The cases discussing the type of loss we are considering speak generally in terms of abandonment. The "abandonment" or "discarding" of an asset would require an act and an intent, as held in *S.S. White, supra,* pp. 121–123, 102 Ct.Cl. 115.

The decision of the Court of Claims in *A. J. Industries, supra* (388 F.2d at 703, 181 Ct.Cl. 1017) started out correctly stating and analyzing the law. It cited § 165(a) of the 1954 Code (26 U.S.C. § 165(a)), quoted Treasury Regulation 118, § 39.23(e)–3 under the 1939 Code, and quoted Regulation § 1.165–2 of the 1954 Code. It then stated (p. 704):

"In order for a loss to be deductible under the pertinent statutory section, it must be shown that the loss was actually sustained during the taxable year; *that the loss became fixed by an identifiable event in such year; and that there was an intention on the part of the owner to abandon the property.* The mere non-use of the property is not enough to constitute an act of abandonment. It is not essential that legal title to the property be lost. Whether the property actually did lose its useful value in a particular year, and whether the owner actually did abandon it as an asset during that year, are questions of fact to be determined from a consideration of all the surrounding facts and circumstances. The issue as to whether the loss was actually sustained calls for a practical, not a legal test, and the standard requires a flexible approach according to the circumstances of each case. *The determination as to the year an asset loses its useful value or becomes worthless is a matter of sound business judgment, and that judgment should be given effect unless it appears from the facts that the decision as to the year of loss was unreasonable or unfair at the time the decision was made.* Thus, the test is whether the plaintiff has established that under all the facts and circumstances and in the exercise of reasonable business prudence, it fairly determined that its investment in its mine was lost and should be abandoned as worthless in 1958." (Citing cases; emphasis added).

The Court of Claims also quoted (388 F.2d at 709–710, 181 Ct.Cl. 1017) extensively from Minneapolis, St. Paul & Sault Ste. Marie R. R. v. United States, 164 Ct.Cl. 226 (1964), which rejected a subjective test of "worthless," basing its holding on Boehm v. Commissioner, *supra,* and held the loss must be sustained in fact, during the taxable year, in order to be deductible.

*Minneapolis* was a *bad debt* case and *Boehm* was a *securities* case. In each category of loss the standard fixed by statute is "worthlessness;" § 166 of the 1954 Code (26 U.S.C. § 166) governs bad debts, and § 165(g) (26 U.S.C. § 165(g)) applies to securities.

Thus the Court of Claims has taken cases in which "worthlessness" is recognized as the statutory test of deductibility for the loss of a bad debt or security and extended the same test to a loss of a capitalized asset.

The basis of the Court of Claims' opinion for denying the loss in 1958 appears to be (1) the fact that the taxpayer continued to carry the mining asset, including the development costs, on its books for fear that a writeoff would

cause the loss of its stock exchange listing, and (2) the fact that 1958 was the first year of profitable operation after 14 successive years of net operating loss. (388 F.2d at 712, 181 Ct.Cl. 1017).

From our reading of Treasury Regulation 118, § 39.23(e)–3 (1939 Code), these conclusions follow:

■ 1. There is nothing in the regulation to indicate that the act of discarding or abandoning the asset must occur in the same year that the asset loses its useful value or in the same year the taxpayer loses the loss of value.

■ 2. It cannot be construed reasonably to *require* or *allow* a loss to become deductible in the year in which the asset loses its value, if the taxpayer does not abandon it, because he reasonably thinks it still has value.

3. The regulation cannot mean that a loss occurs by reason of loss of value, where the taxpayer neither abandons nor intends to abandon the asset, because he reasonably thinks it still has value and should be retained.

■ 4. It is the act of *abandonment* which is the necessary predicate for sustaining the loss. Recognition of the loss is merely the motive or reason which gives rise to the intent to abandon. The taxpayer, in addition to an intent, must take some action.

■ 5. He may claim the loss "for the year in which he takes such action," not the year he formed the intent to abandon, nor the year the asset lost its value.

■ 6. The foregoing is subject to the exception that if the taxpayer realizes the asset is without value and has no reasonable expectation that the asset will again have value, he may not postpone claiming his loss for the purpose of a claim in a later year when, for example, he would secure greater tax benefits.[6b] This is what the taxpayer here did when it first claimed its loss

---

6b. Treasury Regulation § 1.165–2, 1954 Code, in its last sentence, is broad enough to cover this exception. The last sentence reads:
"For this purpose [a deduction for loss] the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment or loss of title to the property occurs."
However, the genesis of the last sentence arose from the problem where taxpayers held real property assets which had become worthless, but were unable to divest themselves of legal title. These situations led to an exception shown by the "Real Estate Cases." A short summary may be helpful.
In the 1939 Code, Treasury Regulation 118, § 39.23(e)–3, covered both depreciable and non-depreciable assets. Following the language covering the allowable loss when "the taxpayer discontinues the business or discards . . . [the] assets permanently from use . . ." there appears this language:
"This exception to the rule requiring a *sale or other disposition* of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property has been prematurely discarded. . . ." (See Footnote [3] for text of Regulation.)
In the 1954 Code, non-depreciable property and depreciable property were placed in separate sections. Regulation 1.165–2(a) cov-

ered non-depreciable property. (See Footnote [6].) Regulation 1.167(a)–8(4) covered depreciable property. It read:
"Section 1.167(a)–8(4): Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), *loss will be recognized* measured by the amount of the adjusted basis of the asset abandoned *at the time of such abandonment*. In order to qualify for the recognition of loss from physical abandonment, *the intent of the taxpayer must be irrevocably to discard the asset* so that it will neither be used again by him nor retrieved by him for sale, exchange or other disposition." (Emphasis added.)
It retained the essence of Treasury Regulation 118, § 39.23(e)–3, 1939 Code—abandonment and intent to abandon. Regulation 1.-165–2(a), 1954 Code, however, included new language: ". . . the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or loss of title to the property, occurs."
A limited exception had been spelled out before the enactment of the 1954 Code. The rule requiring loss of title ("sale or other disposition of property") referred to in Treasury Regulation 118, § 39.23(e)–3, *supra*) worked a hardship on taxpayer whose real property had become worthless

Note 6b—Continued

and who wanted to abandon it and claim the loss but who could not expeditiously divest himself of title. Thus the "Real Estate" exception arose.

In such cases the courts adopted the rule that the taxpayer could claim a loss on real estate without being required to divest himself of legal title if he proved by identifiable events that the property had become worthless and that he did not intend to hold it. See, e. g., Denman v. Brumback (6 Cir. 1932) 58 F.2d 128; Rhodes v. Commissioner (6 Cir. 1939) 100 F.2d 966; W. W. Hoffman, 40 B.T.A. 459 (1939), aff'd sub nom. Commissioner v. Hoffman (2 Cir. 1941) 117 F.2d 987; Alice v. Gordon, 46 B.T.A. 1201 (1942), aff'd sub nom. Helvering v. Gordon (4 Cir. 1943) 134 F.2d 685.

In the *Denman, Rhodes* and *Hoffman* cases, the courts regarded the taxpayer's conduct as the practical equivalent of abandonment even though title had not been disposed of. In *Gordon*, the Tax Court cited those cases but held that the loss on real estate occurred by reason of the property becoming worthless and that an abandonment was not required. The taxpayer had done everything within her power to manifest an intent to divest herself of her fractional interest in the subject property, which interest was shown by identifiable events to have become worthless in the year the loss was claimed. It is apparent from the language of the Tax Court's Opinion that in holding that an abandonment was not required, the court was using that term to mean an "irrevocable loss of title." (46 B.T.A. at 1210.) The court did not mention the requirements of the existing regulation.

In each of these cases, the taxpayer regarded the property as being worthless and did not intend to preserve or hold it and the court believed the taxpayer should not be denied a loss under such circumstances because of the technicalities of title. There is nothing in the decisions to suggest that the rule was meant to give the government a weapon to deny loss deductions by contending that the taxpayer should have regarded the property as worthless in an earlier year than the one claimed. They do not stand for the proposition that the loss can be sustained at a time when the taxpayer intends to hold and preserve the property because of a bona fide belief that it still has potential value or possible future use.

The reverse of the situation is shown in the case of Superior Coal Co., 2 T.C.M. 984 (1943) aff'd sub nom. Superior Coal Co. v. Commissioner (7 Cir. 1944) 145 F.2d 597, cert. den., 324 U.S. 864, 65 S.Ct. 913, 89 L. Ed. 1420 (1945) where a taxpayer, who regarded his real estate as worthless and did not intend to preserve it for its potential value, used the retention of bare legal title as a device to postpone his intended tax deduction to a later and more favorable year.

There, the taxpayer, an Illinois corporation, claimed a loss for the year 1939 with respect to subsurface coal lands located at two mines in Iowa. Taxpayer had mined coal on the properties until 1927, at which time the court expressly found all mining operations on the premises were "abandoned" because the taxpayer could mine coal of superior quality more cheaply from the lands it owned in Illinois. In 1929, taxpayer sold its Iowa power plant and all machinery, cars and other equipment which could be dismantled and the equipment was removed by 1931.

The taxpayer did not divest itself of legal title to the coal rights, however, and did not claim a loss with respect to such rights until 1939. Taxpayer contended that it had tried to sell the coal rights during the interim, but in 1939 terminated its selling effort, fixing that year as the year of loss. Accordingly, the court held that the loss was sustained in an earlier year because the coal rights had become worthless before 1939. In reaching such decision, the court did not discuss the existing Treasury Regulations dealing with abandonment losses, but rather relied upon the rule that a loss on real estate does not depend upon a disposition of legal title. The court's only discussion of the law which it applied was as follows (2 T.C.M. at 986):

"It is well settled that the retention of the bare legal title to property does not prevent a taxpayer from taking a deduction in the year in which the property becomes worthless. Alice v. Gordon [citation]. It is equally well settled that a taxpayer may not be permitted to postpone the taking of a deduction for a loss actually sustained until a year in which the deduction will result in a larger saving in tax."

Revenue Ruling 54–581, 1954–2 C.B. 112 was later issued. It acknowledged that Treasury Regulation 118, § 39.23(e)–3 "requires that the taxpayer shall have discontinued the business or discarded assets permanently in order to claim an abandonment loss for the year in which he takes such action." The ruling then goes on to hold that such is not necessarily the rule, in view of the *Gordon* and *Superior Coal* cases, *supra*, quoting the above paragraph from *Superior Coal Co.* (2 T.C.M. at 986) and concluding:

"Accordingly, it is held that an abandonment loss is deductible only in the taxable year in which it is actually sustained. An abandonment loss which was actually sustained in a taxable year prior to the year in which the overt act of abandonment took place is not allowable as a deduction

and deductions in 1958. *A. J. Industries, supra,* 388 F.2d at 712.

■ 7. The subjective judgment of the taxpayer (here the management) as to whether the business assets will in the future have value is entitled to great weight and a court is not justified in substituting its business judgment for a reasonable, well-founded judgment of the taxpayer. *A. J. Industries, supra,* 388 F.2d at 704, quoted above.

It is clear the district court did not correctly construe the regulation but rather, relying on the contentions of the government and the *Boehm* decision, misapplied the regulation.

### III.

#### *Additional Case·Law*

It has been repeatedly held that in order for a loss of an intangible asset to be sustained and to be deductible, there must be (1) an intention on the part of the owner to abandon the asset, and (2) an affirmative act of abandonment. *E. g.,* S.S. White Dental Mfg. Co. v. United States, *supra,* pp. 121, 122. (We note the decision was written by the late Judge Madden, who, following his retirement from the Court of Claims, sat with distinction as a Senior Judge on our court on many occasions.)

Beus v. Commissioner (9 Cir. 1958) 261 F.2d.176, 180, states:

"As was held by the Tax Court and as has been held by other courts including the Idaho Supreme Court, there must be a concurrence of the act of abandonment and the intent to do so, both of which may be shown from all the surrounding facts and circumstances. Belridge Oil Co., 11 B.T.A. 127; Talache Mines v. United States, 9 Cir., 218 F.2d 491; Helvering v. Jones, 8 Cir., 120 F.2d 828, 830; Carrington v. Crandall, 65 Idaho 525, 147 P.2d 1009. The mere intention alone to abandon is not, nor is non-use alone, sufficient to accomplish abandonment. It is clear from the evidence in this case that those concurrent conditions which must necessarily exist before abandonment can be effective were not proved by the defendants to have existed in the year 1952, . . ."

[9]The government does not comment on *Beus* in its brief.

Talache Mines v. United States (9 Cir. 1954) 218 F.2d 491, 495, 498, cert. denied, 350 U.S. 824, 76 S.Ct. 51, 100 L. Ed. 736 (1955) is further authority in this vein. The government tries to distinguish the case on various grounds and also argues that it is wrong. We think the case was correct, and is a holding requiring an act of abandonment of an asset with intent. *Talache* and *Beus, supra,* show that the necessity of an act and intent is the law of this circuit.

Two district court cases also reflect the rule in the Ninth Circuit, Hummel v. United States (N.D.Cal.1963) 227 F. Supp. 31, 32–33 states:

"It has been held that, where the taxpayer has not relinquished possession of an item, he must prove an 'abandonment', i. e., a concurrence of the act of abandonment and the intent

Note 6b—Continued

in the latter taxable year." (Rev. Ruling 54–581, 1954–2 C.B. 112)

Broader language was used in the 1954 Code in Treasury Regulation § 1.165–2(a) (*supra,* Footnote [6]).

Thus Treasury Regulation § 1.165–2(a), 1954 Code, in its last sentence, clearly arose from and refers to the "Real Estate" exception, but is broad enough to cover a situation where a taxpayer deliberately fails to claim his loss in the year when there was the intent and the act of abandonment, for the purpose of securing more favorable tax treatment in a later year.

The Tax Court in *Superior Coal Company* expressly so stated in the excerpt, supra. In Helvering v. Gordon (4 Cir. 1943) 134 F.2d 685 (review of Alice v. Gordon decision in the Tax Court) the court stated that when the loss had taken place earlier ". . . the retention of the bare legal title becomes a circumstance without significance that should not prevent the taxpayer from taking the deduction in the year in which the loss occurs *or permit him to postpone it at will to some later year when it will produce a larger reduction of tax liability.*" (p. 688) (Emphasis supplied)

to abandon, both of which must be shown from the surrounding circumstances, of such item in order to determine that a loss has occurred in the year of deducting. Neither mere intention alone nor mere non-use alone, is sufficient to accomplish abandonment. Burke v. C.I.R., 32 T.C. 775 (1959) affirmed, 283 F.2d 487 (9th Cir. 1960); Beus v. C.I.R., 261 F.2d 176, 180 (9th Cir. 1958); Talache v. United States, 218 F.2d 491, 498 (9th Cir. 1954), cert. den. 350 U.S. 824, 76 S.Ct. 51, 100 L.Ed. 736 (1955)."

Tanforan Co. v. United States (N.D. Cal.1970) 313 F.Supp. 796, 802–803 states:

"Finally, and again alternatively, the deduction is allowable under established principles relating to losses from the physical abandonment of assets.

"Traditionally, the loss for physical abandonment has been based on evidence establishing an intent to abandon the asset coupled with some overt act or identifiable event to which the abandonment can be related. As stated by the court in United California Bank v. Commissioner of Internal Revenue, 41 T.C. 437, 451 (1964), aff'd per curiam, 340 F.2d 320 (9th Cir. 1964):

'In order to establish actual physical abandonment, there must be an intention on the part of the owner to abandon the property coupled with an act of abandonment, both to be ascertained from all facts and surrounding circumstances.' "

In addition, the Court of Claims stated as follows in Hazeltine Corp. v. United States (1959) 170 F.Supp. 614, 620, 145 Ct.Cl. 138:

"The abandonment of an asset involves an actual intent on the part of the owner to abandon it, plus an act or acts by the owner designed to carry out such intention. Saxlehner v. Eisner & Mendelson Co., 1900, 179 U.S. 19, 31, 21 S.Ct. 7, 45 L.Ed. 60. The element of intent is especially impor-

tant in considering whether there has been an abandonment. Nieman v. Plough Chemical Co., 6 Cir., 1927, 22 F.2d 73, 76, certiorari denied 277 U.S. 603, 48 S.Ct. 563, 72 L.Ed. 1010."

The government dismisses the *Hazeltine* case by quoting the statement of the Court of Claims from *A. J. Industries, supra,* set forth above, which discussed *S.S. White* and *Hazeltine.*

We note there is not necessarily a conflict between *Hazeltine* and *Minneapolis, etc. R. R., supra* (164 Ct.Cl. 226). *Minneapolis* was a bad debt case and its reliance on *Boehm* for a worthlessness standard was proper. *Hazeltine* is an asset case.

The taxpayer also cites the following cases to support its contentions: "Massey-Ferguson, Inc., 59 T.C. No. 22 (1972); United Calif. Bank, 41 T.C. 437, 451–452, Aff'd per curiam 340 F.2d 320 (9th Cir. 1965); George G. Ebner, T.C.Memo. 1958–108, 17 T.C.M. 550, 560–561; Citizens Bank of Weston, 28 T.C. 717 (1957)."

## THE GOVERNMENT'S CASES

The government cites cases from the Second and Third Circuits which it asserts relied on *Boehm* in determining the year of loss by abandonment: James Petroleum Corp. v. Commissioner (2 Cir. 1956) 238 F.2d 678, cert. denied, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664 (1957) and Mine Hill & Schuylkill Haven R. Co. v. Smith (3 Cir. 1950) 184 F.2d 422. In *Mine Hill,* the question was the year of abandonment. The court did not say the loss was sustained because of objective worthlessness but only cited *Boehm* for the limited proposition that there need not be a coincidence of intention to abandon with the act of abandonment, the act alone being sufficient.

*James Petroleum,* the second case, did not involve an abandonment loss. It concerned oil royalty interests, closely akin to securities. Neither the Tax Court below nor the Third Circuit discussed Treasury Regulation 118, § 39.-

23(e)–3, for the loss was not covered by that section.

In the event either case is contrary to our position, we decline to follow them.

The government cites cases characterized by taxpayer as the "Real Estate Cases." Superior Coal Co. v. Commissioner, 2 T.C.M. 984, affirmed (7 Cir. 1944) 145 F.2d 597, cert. denied, 324 U. S. 864, 65 S.Ct. 913, 89 L.Ed. 1420 (1945); and Helvering v. Gordon (4 Cir. 1943) 134 F.2d 685. There is language in such cases to the effect that the loss can be sustained by worthlessness and that abandonment is not necessary. We agree with taxpayer that the cases are a limited exception to the general rule requiring abandonment in business loss cases.

The rationale of the *Gordon* and *Superior Coal* cases was that loss of legal title was not prerequisite to a claim for loss from abandonment of a worthless real property asset, but that a taxpayer must not be permitted to postpone the taking of a deduction for the purpose of obtaining a larger saving in tax in later years. This rationale concerning title was adopted by the Commissioner in Revenue Ruling 54–581, 1954–2 C.B. 112, as justification for an admitted deviation from the requirement of Regulation 118, § 39.23(e)–3. (See Footnote [6b]).

But in any event, the cases involved real property and not an intangible asset as in our case. Neither case attempted to relate its rationale to the express language of § 39.23(e)–3.

The government cites C–O Two Fire Equipment Co. v. Commissioner (3 Cir. 1955) 219 F.2d 57. The case is not in point. The deduction there claimed was due to obsolescence of inventory. Such a deduction is *not* governed by § 39.-23(e)–3.

Finally, the government cites Meyer v. Commissioner (8 Cir. 1957), 243 F.2d 262, cert. denied, 355 U.S. 862, 78 S.Ct. 94, 2 L.Ed.2d 68 (1957), holding that a loss in promoting a patent was due to worthlessness. Section 39.23(e)–3 was not cited or discussed in the opinion, nor were the abandonment cases referred to above, cited therein. If the case is contrary to our opinion, we do not choose to follow it.

## SUMMARY

The district court, in its Conclusions of Law, Nos. 6 through 10, *supra*, paid lip service to the 1939 and 1954 Regulations cited therein and did not rely on (1) an act of abandonment, and (2) an intent to abandon. Instead, the district court, accepting the government's contentions below, concluded that worthlessness was the main criterion, to be judged by objective standards irrespective of the subjective intent of management. In short, it rejected taxpayer's contention that, based on the regulations and case law, there must exist (1) some act of abandonment, and (2) an intent by the taxpayer to abandon, in order for a loss to be sustained.

An analysis of Regulation 118, § 39.-23(e)–3 of the 1939 Code demonstrates the trial court did not interpret the regulation or base its decision on it. The case law shows it should be followed when a business loss of a capitalized asset is claimed. The Ninth Circuit has clearly held that for a loss by abandonment to occur there must be (1) an act and (2) an intent to abandon. The government's cases are either not in point, poorly reasoned, or from other circuits.

Certainly, under the statutory tax scheme, the loss had to occur in a single *particular* year. The year 1958 was first relied on by the taxpayer, since in that year it adopted a corporate resolution directing its officers to abandon the investment in the mine and write it off its books on December 31, 1958. But the Court of Claims in A. J. Industries, Inc. v. United States, 388 F.2d 701 (1967) held that the mine became worthless prior to 1958.

As to the years 1956 and 1957, here in issue, the government contends that Finding No. 92 defeats the taxpayer. It reads, "The matter of abandoning the mining operation was considered by

plaintiff's new management at various times after they acquired office in 1956, *but no definitive action was taken until 1958 . . . ."* (Emphasis supplied).

The taxpayer responds that the Court of Claims' decision is only res adjudicata as to the year 1958 and that it held the loss occurred *prior* to 1958. The fact that "no definitive action" was taken until 1958 is not fatal to taxpayer in view of the holding that the loss occurred *prior to 1958*. This left open for the district court to find the year in which (1) an act of abandonment and (2) the intent to abandon occurred.

The taxpayer relies on Finding No. 60 [7] to the effect that a majority of taxpayer's board of directors, from 1944 through the early part of 1956, believed that mining could eventually be resumed at the Juneau mine and that the assets should be preserved; and on Finding No. 65 [8] setting forth a letter from the taxpayer's president, dated May 10, 1956 (during the proxy fight with the group that later took over management of plaintiff), justifying the position of the incumbent management in preserving the mine; and on Finding No. 77 [9] showing that in late 1956 the taxpayer

7. "60. A majority of plaintiff's board of directors from 1944 through the early part of 1956 believed that the price of gold was likely to be increased, and that mining could eventually be resumed at the Juneau mine. It was their policy throughout that period that the Juneau assets should be preserved intact, as far as possible, for a further resumption of operations when conditions improved. Each year after 1944, as the labor force available became smaller, less maintenance was accomplished and the natural deterioration of the mine increased."

8. "65. In response to the arguments and contentions of the stockholders Action Committee, incumbent management's proxy materials incuded a letter from plaintiff's president, C. A. Norris, to the stockholders, dated May 10, 1956, which contained the following statement reflecting the policy of the incumbent management:

BACKGROUND OF YOUR COMPANY

The major asset of your Company is the gold mine at Juneau, Alaska, from which we were extracting some 4,200,000 tons of ore annually during the pre-War years, together with a mill with a daily capacity of approximately 14,000 tons of ore. In addition, the Company owns extensive mining equipment and a power system at Juneau which now sells electricity commercially.

During the 15 years of full-scale operation of this mine preceding our entry into World War II, operations were highly successful, and liberal dividends totaling in the aggregate over $14 million were distributed to stockholders in the 12 years ending 1941, after paying off loans of $5 million incurred in developing the mine. The mine was shut down in 1944 because of rising costs brought on by the War. The costs of mining have risen continuously and substantially ever since, while the price of gold remains fixed by govern-

ment decree at its pre-War level. This has produced a state of depression for the whole gold-mining industry and has had a particularly adverse effect upon our operations, since we depend upon large volume at a low margin of profit.

While it has been evident since the War that the mine could be operated only at a loss under the prevailing economy, nevertheless there has always been some degree of hope for an upward revision of the price of gold. With this possibility ever present, and taking into account the high cost of replacing the mining plant, your Management tenaciously has preserved the mine and mining plant for almost immediate resumption of operations, in the event of the end of the depression for gold.

We cannot forecast when this will occur but through all of the recorded civilization gold has remained one of our most cherished and sought-after commodities. We are confident that eventually gold will come into its own again.

In the meantime, the mine at Juneau represents an asset of little immediate but great potential value. This asset has been preserved intact for the shareholders.

\*       \*       \*       \*       \*

During the years since the mine was closed down dozens of other ventures have been considered to produce new sources of income. Most of these could not be acquired on terms regarded as advantageous to Alaska Juneau or were beyond the ability of your Company, with its limited capital, to finance. Our experience along these lines has convinced us that only by substantially increasing the authorized share capital can your Company be put in a position to bargain seriously for desirable new acquisitions."

9. "77. To raise the remaining $100,000 to acquire Reynolds, plaintiff, in late 1956, entered into an agreement with Caine Steel

gave an option to Caine Steel Co. to the salvage rights to the mine equipment, replacement parts and scrap material in return for $100,000 to be used as a downpayment for the acquisition of the Reynolds Mfg. Company; and Finding No. 78 [10] stating that in late 1956 or early 1957, Caine Steel Co. assigned its options to Machinery Center, Inc., and that on January 28, 1957, Machinery Center entered into an agreement to salvage the mining and milling equipment, and taxpayer received an additional $100,000 to be used for the acquisition of Reynolds Mfg. Co.

Taxpayer thus contends that the findings show the loss did not occur before 1956 but occurred in 1956 or 1957 when " . . . the loss became fixed by an identifiable event in such year; and that there was an intention on the part of the owner to abandon the property." *A. J. Industries, supra,* p. 704. We think the plaintiff is correct and that there was no intent to abandon nor any identifiable event prior to mid-1956.

The facts were stipulated. We see no need to send the case back to the district court for any further fact-finding on the issue of the year of loss. We think only one conclusion on the issue can be drawn from this record.

In 1956 there existed only the option to salvage, which might never have been exercised. But in 1957 a contract for salvage was executed. Thus there existed in 1957 "closed and completed transactions, fixed by identifiable events," Regulations § 1.165–1(b), "occurring in such taxable year," Regulation § 1.165–1(d) (both 1954 Code). The year 1957 was the year "the taxpayer discontinue[d] the business or discard[ed] such assets permanently from use in such business" and "he [the taxpayer] may claim . . . [the] loss for the year in which he [took] such action. . . ." Treasury Regulation 118, § 39.23(e)–3 (1939 Code). In 1957 there existed the intent to abandon and the act of abandonment of the business asset (the capitalized development costs). *See* cases cited, *supra.*

We conclude that the district court misapplied the applicable regulation, ignored the Ninth Circuit cases, and mistakenly relied on Boehm v. Commissioner, *supra.* In summary, the district court used the wrong criterion to determine the year of loss.

The judgment is reversed and the case remanded for entry of a judgment that the loss occurred in 1957. The district court will determine the amount of that loss.

Co., of Los Angeles, giving Caine an option on the salvage rights to plaintiff's mine equipment, replacement parts and scrap materials. In return for this option, plaintiff received $100,000 in cash which was used to complete the down payment for the Reynolds acquisition."

10. "78. In late 1956 or early 1957, Caine Steel Co. assigned its option on plaintiff's salvage rights to Machinery Center, Inc., a Utah corporation. Subsequently, on January 28, 1957, plaintiff and Machinery Center entered into a written agreement appointing Machinery Center as plaintiff's 'exclusive sales agent' on a 'best efforts' basis to dismantle, salvage and sell the Juneau mining and mill equipment. Only the powerplant, dams, powerlines, and other equipment used in its power operation were excepted from this contract. In this agreement plaintiff stated that it realized that the resumption of mining in June was not economically feasible within the foreseeable future. The agreement provided for an advance of $200,000 to plaintiff on its share of the anticipated proceeds from the salvage operation. The $100,000 already received by plaintiff in 1956 from Caine Steel Co. was credited against such advance. Plaintiff's purpose in selling the machinery was to raise funds for the acquisition of the Reynolds Manufacturing Company. This agreement was terminated in 1959. Plaintiff entered into negotiations for a new contract to accomplish the sale of the machinery and equipment."